

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

AMIGA, INC., f/k/a KMOS, INC.,                    :    **Civil Action No.**

                      Plaintiff,     :

        -against-                         :    **COMPLAINT FOR**
                            :    **DECLARATORY JUDGMENT**
GARRY HARE,                                       :

                Defendant.     :

--------------------------------------------------------  x

      Plaintiff, Amiga, Inc. (hereinafter "Amiga" or the "Company"), formerly known as

KMOS, Inc., by and through its attorneys Reed Smith LLP, for its Complaint against defendant,

Garry Hare (hereinafter "Hare"), hereby alleges as follows:

**JURISDICTION AND VENUE**

      1.    This Court has diversity jurisdiction over the subject matter of this action under

28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and this action is between citizens of different states.

      2.    An actual and present controversy exists between the parties within the meaning

of 28 U.S.C. § 2201 (Declaratory Judgments).

      3.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(a).

**PARTIES**

      4.    Amiga is a New York corporation with a principal place of business at 167

Madison Avenue, Suite 301, New York, New York 10016.

      5.    Amiga produces and distributes enabling technologies and applications for wired

and wireless devices. Amiga was formerly known as KMOS, Inc.

      6.    Hare is an individual residing in the State of California.

NWKLIB-89280.1

Dockets.Justia.com

## FACTS COMMON TO ALL COUNTS

### Hare Fraudulently Induces Amiga to Take Him on as a Strategic Business Partner

7.      On or about September 2003, Amiga and Hare were engaged in negotiations concerning Hare joining Amiga as Chief Executive Officer.  Amiga entered these negotiations with the intent of forming a strategic "partnership" with Hare pursuant to which Hare would, among other things, introduce the Company to financing and capital markets and strategic investors, manage Amiga's operations and employees, and grow the Company generally.  In return, this arrangement would be structured in such a way that Hare could realize financial rewards depending upon Hare's success in growing the Company.

8.      During these negotiations, Hare made fraudulent and intentional material misrepresentations to Amiga including, without limitation, misrepresentations concerning his previous employment, job performance, experience, skills and abilities.  For instance, Hare intentionally misrepresented his knowledge and experience in the technology solutions field, his connections and relationships with industry leaders and investors in the financial services industry.  Hare also emphasized his purported ability to secure financing for start-up companies. At the time Hare made these and other material fraudulent misrepresentations, Amiga was unaware that they were misrepresentations.

9.      Hare knowingly made these and other false representations to Amiga with the intention of having Amiga rely upon such misrepresentations such that Amiga would enter into a business relationship with Hare to its detriment.

10.     Relying on Hare's fraudulent misrepresentations, Amiga agreed to form a strategic "partnership" with Hare.  Under this arrangement, Amiga entered into a contingent employment agreement with Hare on September 25, 2003.  The parties subsequently replaced the

September 25, 2003 contingent agreement with another contingent employment agreement on October 6, 2003 (hereinafter "the Contingent Agreement"). (Exhibit "A" attached hereto)

11.    The Contingent Agreement was expressly conditional upon Amiga, through Hare's direct connections and efforts, securing a minimum of $1,000,000 in funding for the operations of Amiga. Hare never satisfied this condition precedent.

12.    Based upon Hare's misrepresentations, Amiga also granted Hare stock in Amiga as well as stock in other entities as part of their strategic business arrangement.

**Hare Fails to Honor his Obligations as an Amiga Strategic Business Partner and Breaches His Duty of Loyalty to the Company**

13.    As a Strategic Business Partner, Hare was responsible for, among other things, growing the Company's business, raising capital, marketing the Company, developing a budget and operating plan, and managing the Company's overall operations. Not only did Hare disregard these responsibilities, but he engaged in affirmative misconduct that has harmed and damaged Amiga and its owners personally.

14.    For instance, during meetings with potential investors, Hare displayed a complete lack of knowledge about Amiga and its products and the technology solutions field generally, resulting in a loss of funding and investment opportunities.

15.    Additionally, in an attempt to persuade potential investors into funding Amiga, Hare made intentional and material fraudulent misrepresentations to potential investors. Upon learning of Hare's misrepresentations, these potential investors decided not to invest in Amiga.

16.    Hare also claimed to potential investors that Amiga owned a "killer" application, the product "Noids," and sought funding for the development of the Noids product. Amiga, however, had no agreement with Noids and was not in the business of developing or promoting Noids.

17.    Amiga later learned that Noids was a product apparently owned and developed by Hare for his personal benefit only, and that Hare, without the Company's knowledge or approval, directed and utilized Company employees and resources to develop Noids on Company time to the Company's material detriment.

**Anticipating that Amiga was About to Terminate its Relationship with Him, Hare Preemptively Ends the Relationship and Improperly Seeks to Enforce the Contingent Agreement**

18.    Upon learning of Hare's misrepresentations to potential investors, and in an effort to limit any further damage Hare could cause the Company and its stockholders, Amiga directed Hare in or about August 2005 to stop meeting with potential investors.

19.    Anticipating that Amiga was close to ending its relationship with him because of his misrepresentations and failure to carry out his responsibilities, Hare chose to voluntarily terminate the relationship on August 4, 2005.

20.    Despite Hare's representations that he had vast contacts within the financial services industry and investing public, and that he could successfully raise capital for Amiga and grow the business, Hare did not secure any financing for Amiga, let alone the $1,000,000 threshold amount required, at a minimum, to trigger the Contingent Agreement.

21.    Hare has now tried to turn his voluntary termination of his relationship with Amiga into a sword.  Indeed, despite the fact that he did not satisfy the condition precedent to the Contingent Agreement, Hare has wrongfully alleged to the Company that the Contingent Agreement is in full force and effect and that the Company purportedly owes him severance in excess of $1,000,000 for an alleged "Termination by Employee For Good Reason" under the Contingent Agreement.

22.     After voluntarily terminating his relationship with Amiga, Hare has engaged in intentional conduct calculated to sabotage and otherwise interfere with Amiga's relationships with current and potential customers, investors and employees by attempting to give the false impression that Amiga's business operations were somehow unstable.  For example, Hare posted a message on Amiga's electronic message board designed to harm Amiga and undermine the Company's efforts with forthcoming announcements respecting Company deals.

**COUNT I**
**(Breach of Duty of Loyalty)**

23.     Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

24.     As part of his relationship with Amiga, Hare had access to customer lists, trade secrets, confidential files and other proprietary information respecting Amiga, its business operations and its customers (collectively referred to as "Confidential Information").  The Confidential Information is not known by or generally available to the public.

25.     Amiga has developed the Confidential Information (at considerable expense and effort) based upon knowledge of its own business, clients, capabilities and projections.  That being so, it would be impossible for competitors to duplicate the information or learn the Confidential Information without being privy to inside information.  Consequently, Amiga closely guards the information and attempts to protect it from competitors.

26.     Hare, Amiga's former Chief Executive Officer and director, owes plaintiff a duty of loyalty.  This duty of loyalty included a duty to act with the utmost good faith in the furtherance and advancement of the interests of plaintiff and a continuing duty of loyalty not to use, disclose or misappropriate the Confidential Information.

27.    Hare intentionally and maliciously breached his common law duty of loyalty owed to plaintiff by, among other things, his unauthorized use and diversion of Amiga resources and employees to develop and promote Noids, and, upon information and belief, by using the Confidential Information to his own advantage in furthering Noids and potentially other products.

28.    As a direct and proximate result of Hare's breach of his common law duty of loyalty, plaintiff has been and continues to be injured in its business and property including, but not limited to, present and future economic loss and loss of competitive advantage in the field of technology solutions.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

(a)    For compensatory damages, including, without limitation, any profits Hare (and/or others) has earned and may earn from the Noids product and transfer all Intellectual Property related to Noids to the Company;

(b)    For punitive damages; and

(c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate, including injunctive relief necessary to prevent Hare from continuing to breach his common law duty of loyalty.

## COUNT II
### (Misappropriation of Trade Secrets and Confidential Information)

29.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

30.    The Confidential Information is comprised of Amiga's trade secrets.    Upon information and belief, Hare has and will continue to misappropriate plaintiff's trade secrets and Confidential Information.

31.    As a direct and proximate result of the misappropriation, plaintiff has been and continues to be injured in its business and property, including, but not limited to, present and future economic loss and loss of competitive advantage in the field of technology solutions.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against defendant as follows:

    (a)    For compensatory damages, including, without limitation, any profits Hare (and/or others) has earned and may earn from the Noids product;

    (b)    For punitive damages; and

    (c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate, including injunctive relief necessary to prevent Hare from continuing to misappropriate plaintiff's trade secrets and Confidential Information.

## COUNT III
### (Conversion)

32.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

33.    Hare has intentionally and unlawfully exercised dominion over Amiga's property, including but not limited to, Company resources he diverted without Amiga's knowledge or approval for his own benefit.

34.    Hare's conduct constitutes a conversion of Amiga's property contrary to law.

35.    Hare's acts of conversion were committed willfully, knowingly, maliciously, and in conscious disregard of his common law obligations to Amiga.

36.    As a direct and proximate result of the conversion, plaintiff has been and continues to be injured in its business and property, including, but not limited to, present and future economic loss and loss of competitive advantage in the field of technology solutions

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against defendant as follows:

      (a)    For compensatory damages, including, without limitation, any profits Hare (and/or others) has earned and may earn from the Noids product;

      (b)    For punitive damages; and

      (c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT IV
### (Tortious Interference with Business Relations)

37.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

38.    Upon information and belief, Hare's acts constituted devious, improper, unrighteous acts intentionally designed to disrupt and interfere with Amiga's economic relationships with its current and potential customers, investors and business associates.

39.    Upon further information and belief, Hare knowingly and willfully acted to damage Amiga by depriving it of the benefits of its economic relationships with its current and prospective customers and investors.

40.    As a direct and proximate result of Hare's actions, plaintiff has been and continues to be injured in its business and property, including, but not limited to, present and future economic loss and loss of competitive advantage in the field of technology solutions.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against defendant as follows:

      (a)    For compensatory damages, including, without limitation, the profits and investment capital plaintiff has lost as a result of Hare's tortious interference;

      (b)    For punitive damages; and

(c)  For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT V
**(Tortious Interference with Prospective Economic Advantage )**

41.   Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

42.   By virtue of the aforementioned, Hare has interfered with plaintiff's reasonable expectation of prospective economic advantage with current and potential customers and investors.

43.   Hare's interference with plaintiff's reasonable expectation of prospective economic advantage with current and potential customers and investors was intentional and malicious and diminished plaintiff's reasonable expectations of economic advantage with such current and potential customers and investors.

44.   As a direct and proximate result of Hare's interference with plaintiff's reasonable expectation of prospective economic advantage with current and potential customers and investors, plaintiff has been and continues to be injured in its business and property, including, but not limited to, present and future economic loss and loss of competitive advantage in the field of technology solutions.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against defendant as follows:

(a)  For compensatory damages, including, without limitation, the profits and investment capital plaintiff has lost as a result of Hare's tortious interference;

(b)  For punitive damages; and

(c)  For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT VI
### (Fraudulent Inducement)

45.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

46.    In negotiating the potential strategic business "partnership" with Amiga, Hare made representations to Amiga that he had the necessary skill, expertise, background and experience to among other things, secure financing for Amiga, run Amiga's operations, manage Amiga's employees and grow the Company.

47.    Hare knowingly made these statements to Amiga despite his knowledge that his skill, expertise, background and experience were inadequate to effectively perform such services.

48.    Hare made these statements to Amiga with the intent of inducing Amiga to form a business relationship with Hare and to secure an ownership interest in the Company and other entities.

49.    Amiga relied on Hare's statements, and as a direct result of Hare's statements, Amiga signed the Contingent Agreement, formed a business relationship with Hare and granted him stock in Amiga and other entities.

50.    As a direct result of forming this partnership with Hare, Amiga has been forced to incur substantial harm and damages, including, without limitation, special damages in the form of lost business and opportunities.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

(a)    For compensatory damages;

(b)    For punitive damages; and

(c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate,

- 10 -

including, without limitation, ordering Hare to return all stock granted to him or, if such is not possible, an appropriate monetary payment to Amiga representing the value of such stock.

## COUNT VII
### (Fraudulent Concealment)

51.     Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

52.     In negotiating the potential strategic business "partnership" with Amiga, Hare made representations to Amiga that he had the necessary skill, expertise, background and experience to, among other things, secure financing for Amiga, run Amiga's operations, manage Amiga's employees and grow the Company.

53.     Hare knowingly made these statements to Amiga despite his knowledge that his skill, expertise, background and experience were inadequate to effectively perform such services.

54.     Hare made these statements to Amiga with the intent of inducing Amiga to form a business relationship with Hare and to secure an ownership interest in the Company.

55.     Hare had a duty to disclose accurate information to Amiga respecting his skill, expertise, background and experience but he failed to do so.

56.     Amiga relied on Hare's statements, and his failure to disclose this material information.   In so doing, Amiga signed the Contingent Agreement, formed a business relationship with Hare and granted him stock in Amiga and other entities.

57.     As a direct result of forming this partnership with Hare, Amiga has been forced to incur substantial harm and damages.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

(a)     For compensatory damages;

- 11 -

(b)    For punitive damages; and

(c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate, including, without limitation, ordering Hare to return all stock granted to him or, if such is not possible, an appropriate monetary payment to Amiga representing the value of such stock.

## COUNT VIII
### (Negligent Misrepresentation)

58.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

59.    Hare negligently concealed, misrepresented and failed to advise Amiga about his lack of skill and expertise necessary to perform services, including but not limited to Hare's inability to secure funding for Amiga.

60.    Because of Hare's negligent concealment and misrepresentations, Amiga suffered and will continue to suffer substantial harm and damages.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

(a)    For compensatory damages;

(b)    For punitive damages; and

(c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate, including, without limitation, ordering Hare to return all stock granted to him or, if such is not possible, an appropriate monetary payment to Amiga representing the value of such stock.

## COUNT IX
### (Defamation)

61.     Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

62.     Upon information and belief, Hare knowingly made defamatory publications that he either knew were false, or the import of which were intended to give false impressions about the Company.

63.     Upon further information and belief, Hare made such publications in bad faith without privilege or justification to Amiga's current and prospective customers, investors and/or employees with the specific intent to cause harm to the reputation of Amiga.

64.     Upon further information and belief, Hare acted oppressively, maliciously, fraudulently and outrageously towards Amiga with conscious disregard for Amiga's known rights and with the intention of causing Amiga harm in making such publications.

65.     As a result of Hare's conduct, Amiga suffered and will continue to suffer substantial harm and damages, including, without limitation, special damages in the form of lost business and opportunities.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

      (a)     For compensatory damages;

      (b)     For punitive damages; and

      (c)     For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT X
### (Commercial Disparagement)

66.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

67.    Upon information and belief, Hare knowingly made defamatory publications that he either knew were false or the import of which were intended to give false impressions about the Company.  Such publications were calculated to prevent others from dealing with Amiga and/or to interfere with Amiga's relations with others to its disadvantage.

68.    As a result of Hare's conduct, Amiga suffered and will continue to suffer substantial harm and damages, including, without limitation, special damages in the form of lost business and opportunities.

WHEREFORE, plaintiff respectfully prays that the Court enter judgment against Hare as follows:

(a)    For compensatory damages;

(b)    For punitive damages; and

(c)    For prejudgment and post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems appropriate.

## COUNT XI
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

69.    Plaintiff repeats, re-alleges and incorporates by reference all allegations as set forth above as though fully set forth herein.

70.    In a case of actual controversy within its jurisdiction, a court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the full force and effect of a final judgment or decree.

71.    A declaratory judgment in this case would serve a useful purpose in clarifying and settling the legal relations between the parties and would terminate and afford relief from uncertainty and the controversy giving rise to this and possibly other proceedings.

72.    An actual controversy exists in this case because Hare claims he is somehow entitled to relief under the Contingent Agreement, which never went into effect.

73.    By virtue of all of the aforementioned allegations, Amiga is entitled to a declaratory judgment declaring that:

(a)    The Contingent Agreement (and all of its accompanying provisions) is void and wholly unenforceable;

(b)    The September 25, 2003 Contingent Agreement (and all of its accompanying provisions) is void and wholly unenforceable;

(c)    Amiga has no obligations to Hare (or anyone else) under the Contingent Agreement;

(d)    Amiga has no obligations to Hare (or anyone else) under the September 25, 2003 contingent agreement; and

(e)    Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:   New York, New York
         October 21, 2005

REED SMITH LLP

By: _____
     STEPHEN D. BIRD (SB 7294)
     For the Firm

599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
*Attorneys for Plaintiff Amiga, Inc.*

- 15 -

# EXHIBIT "A"
# CONTINGENT AGREEMENT

*Amiga, Inc., f/k/a KMOS, Inc. v. Hare*
*Civil Action No:  05-CV-8986 (DAB)*

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made as of the date set forth below by and between KMOS, INCORPORATED., a Delaware corporation ("Employer"), and GARRY HARE, an individual ("Employee"). This agreement in its entirety is contingent on KMOS, Inc. securing a minimum of $1,000,000 in funding for the operation of the Company.

1.    **Employment.**    Employer hereby employs Employee, and Employee accepts such employment, upon the terms and conditions set forth in this Agreement.

2.    **Position and Services**

(a)    Duties.    Employee will initially occupy the position of President and Chief Executive Officer (CEO). Employee shall initially be responsible for overall management of the Company and such other related and consistent duties as may reasonably be required by Employer's Board of Directors. In addition, in co-operation with the Company's Board of Directors, Employee will use his best efforts to secure investment and funding as required for building the Company.

(b)    Best Efforts.    During the Employment Period, Employee will devote his best efforts and attention to the performance of his duties and to the business affairs of the Employer, except for vacation periods and reasonable periods of illness or other incapacities as permitted by employer's general employment policies. Employee may speak at industry conferences and may serve (at his own expense for travel, etc.) on corporate and advisory boards of entities that do not directly compete with Employer.

(c)    Reporting Relationship.    Employee shall report directly to the Chairman of Employer's Board of Directors.

(d)    Location.    Employee shall establish Employer's California office within 20 miles of San Rafael, California.

3.    **Term.**    Unless earlier terminated in accordance with the provisions of Section 5, this Agreement shall remain in effect until the fourth anniversary of the date hereof. All references to a "year" of this Agreement shall refer a year beginning on the month and date of original execution.

4.    **Compensation & Benefits**

(a)    Salary.    During the initial year, Employer shall pay to Employee, on a monthly basis unless deemed by the employer to be more frequent, a base salary at the annual rate of $300,000, less applicable legal deductions, payable in accordance with the regular payroll practices of the Company. Unless the parties otherwise agree, such base salary shall be increased by a minimum of 5.00 % per annum beginning with the first month following each year of service.

(b)    Participation in Benefit Plans. During the term, Employee shall be entitled to participate in any stock option, profit sharing, retirement, group insurance, hospitalization, medical, dental, health and accident, disability or similar plan or program of Employer now existing or established in the future. Whether or not such benefit is included in a company-wide plan or program, Employee shall be afforded full medial coverage for himself, his spouse, and dependants younger than eighteen years of age.

1

(c)     Vacation.     Employee shall be entitled to a period of annual vacation time equal to that provided to employees of equal position by Employer's policies regarding vacation time, but in no event less than (1) the period running from Christmas Day through New Year's Day, plus (ii) two weeks per year.

(d)     Employee Initial Stock and Ownership.

(i) Employer hereby grants to Employee 1,750,000 shares of KMOS, Incorporated Common Stock, with a par value of $.0001 per share.

(ii)     If (but without any obligation to do so) Employer proposes to register any of its common stock under the Securities Exchange Act of 1933, as amended, it shall promptly give Employee written notice of such proposed registration on a timely basis permitting Employee to exercise all or any portion of its options in time to acquire shares which would be included under such registration, and Employer shall then cause to be registered under the Act all of the Employee-owned shares which Employee has requested to be registered.

(e)     Cash Bonus Program. Employee shall be eligible for a cash bonus determined according to the following formula: cash bonus of 2% of the growth in gross revenue calculated annually and based on the anniversary date of this agreement. During Employee's employment, Employer and Employee shall, upon mutual agreement, add further clarity and detail regarding the revenues and other benefits to Employer that are applicable to the calculation of Employee's cash bonus.

5.     Indemnification of Employee.   Employer agrees to indemnify Employee, and to hold him harmless, against any liability or expense, and against the cost (using counsel approved by Employee) of defending against any such claims, arising out of or otherwise related to any acts or omissions of Employer, its officers, directors, employees or agents which occurred (or, in the case of an omission, which failed to occur) prior to the effective date of this Agreement.

6.     Termination.

(a)     Termination Without Cause.     In the event Employee's employment is terminated without cause he shall be entitled to a continuation of the salary and benefits that Employee would otherwise have been entitled to had he remained employed for the whole of his employment term, as well as immediate vesting of any bonus for which he would have otherwise been eligible under the cash bonus program. All salary and bonuses payable under this section shall be paid at the same time and basis as Employer pays its payroll in general.

(b)     Termination by Employer With Cause.

(i)     Employer may terminate Employee's employment with Employer at any time for cause, immediately upon notice to Employee of the circumstances leading to such termination for cause; provided, however, that if the stated grounds for such termination are susceptible of cure, Employee shall be allowed a reasonable period (not to exceed 60 days) to effect such a cure, and if such cure is successful Employer shall not proceed with termination of Employee's employment without such termination being deemed without cause.

(ii)     For the purpose of Sections 5(a) and 5(b) "cause" shall mean: (A) habitual neglect or insubordination (defined as a refusal to execute or carry out directions from the BoD); (B) conviction of any felony or crime involving moral turpitude; (C) willful breach of Employee's duties to Employer; or (D) conduct by Employee, which in the good faith, reasonable determination of the BoD of Employer demonstrates gross unfitness to perform the duties set forth in Section 2(a) above.

2

(c)    Termination by Employee For Good Reason

(i)    Employee may terminate his employment with Employer at any time for Good Reason. In the event Employee's employment is terminated by Employee for Good Reason, Employee shall be entitled to the same severance compensation as is provided in Section 5(a) above.

(ii)    For the purpose of this Section 5(c), "Good Reason" shall mean: (a) a material change in Employee's roles, responsibilities or reporting relationship without Employee's consent; or (b) a relocation of Employee's principal place of business more than 20 miles from San Rafael, California without Employee's consent or (c) material failure of Employer to provide Employee his compensation and benefits in accordance with the terms of this Agreement, which failure is not cured within fifteen (15) days after written notice thereof by Employee to Employee.

7.    **Confidentiality and Non-Solicitation**    Employee agrees to be bound by the provisions of the Confidentiality and Non-Solicitation Agreement which is Attachment A hereto.

8.    **Resolution of Disputes**

(a)    Arbitration.    In the event of a dispute hereunder which the parties are unable themselves to resolve, either party may submit such dispute to binding arbitration before a single arbitrator at the office of Judicial Arbitration and Mediations Services (JAMS) in San Francisco, California. The award issued in such arbitration proceeding shall be enforceable in any court of competent jurisdiction.

(b)    Attorney's Fees.    The prevailing party in such an arbitration or judicial enforcement proceeding shall be awarded its costs thereof, including reasonable attorney's fees.

(c)    Governing Law. This Agreement and any dispute arising hereunder shall be interpreted and enforced under the laws of the State of California.

Dated: October 6, 2003

KMOS INCORPORATED, Employer

By: _____

Print Name: PENTTI KOURI

Title: CHAIRMAN _____

_____

GARRY HARE, Employee

3

ATTACHMENT A

## CONFIDENTIALITY & NONSOLICITATION AGREEMENT

KMOS, INCORPORATED ("Employer") and its undersigned Employee, in consideration of Employee's continued employment by Employer, agree as follows:

**1.    Use of Confidential Information.**    In the course of Employee's employment by Employer, Employee will have access to customer lists, trade secrets, confidential files, and other proprietary information respecting Employer, its business operations and its customers which is not known by or generally available to the public (collectively "Confidential Information"). Employee agrees that he/she shall not, during or after their employment by Employer, use any Confidential Information for other than Employer purposes or disclose any such information to any third parties except with Employer's express approval. Within five (5) business days after the termination of Employee's employment, he/she shall return to Employer all copies, whether in print, electronic or other form, of any Confidential Information then in Employee's possession, and shall certify to Employer that all such information has been returned.

**2.    Non-Solicitation.**    Employee agrees that, during the term of his/her employment and for two (2) years after the termination of such employment for any reason:

a.    Employee shall not directly or indirectly solicit any other Employer employee to terminate their employment with Employer.

b.    Employee shall not, except as an employee of and on behalf of Employer, directly or indirectly (e.g., through another employer or business) contact, solicit, or otherwise approach any customer of Employer for the purpose of seeking their business or business assistance. For the purpose of this subsection, a "customer or prospect of Employer" is a customer, client or current business prospect of Employer, excepting only those individuals and entities (if any) which were customers or clients of Employee prior to entering the employment of Employer and which are listed on Attachment "A" hereto.

**3.    Survival of Agreements - Amendments.**    Employee's undertakings in this Agreement shall survive any termination of his/her employment for any reason. This Agreement may be amended only by a writing, executed by both parties, which declares that it is intended to be such an amendment.

Dated: October 6, 2003

KMOS INCORPORATED, Employer

By: _____

Print Name: _PENTTI KOURI_

_____
GARRY HARE, Employee

4