REED SMITH LLP
599 Lexington Avenue, 29th Floor
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Attorneys for Plaintiff
Amiga, Inc., f/k/a KMOS, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMIGA, INC., f/k/a KMOS, INC., | Civil Action No. 05-CV-8986 (DAB) |
| Plaintiff, | |
| *vs.* | |
| GARRY HARE, | **DECLARATION OF PENTTI KOURI** |
| Defendant. | |

I, Pennti Kouri, hereby declare as follows:

1.    I am the Chairman of the Board of Directors of Amiga, Inc. ("Amiga" or "the Company"), formerly known as KMOS, Inc. I have served in this capacity since the Company's inception in October 2003. I currently reside in and work in New York City and have done so since January 1992.

2.    I submit this declaration in opposition to defendant's motion to dismiss Amiga's Complaint and in support of Amiga's cross-motion to dismiss or, alternatively, stay the arbitration proceeding defendant is attempting to pursue against Amiga and me (personally) in San Francisco. This declaration is based on my personal knowledge.

3.    Amiga produces and distributes enabling technologies and applications for wired and wireless devices. Amiga's technology solutions include AmigaAnywhere™ and the Amiga family of operating systems. AmigaAnywhere™ is high-performance, low-resource, network-

NWKLIB-90615.1

distributed software enabling easy use of high quality audio-visual and multimedia content. This technology supports devices running Microsoft's Windows Mobile including CE, PocketPC SmartPhone, as well as MonteVista, Red Hat, Debian, and Suse Linux. Future versions will support most modern processors and all major operating systems.

## Subject Matter Jurisdiction

4.      Contrary to defendant's contention, Amiga's principal place of business is not in California. Rather, the Company's operations are spread out in various locations, with the Company's principal place of business at 167 Madison Avenue, Suite 301, New York, New York 10016.

### Sales Operations

5.      While Amiga has a sales person in the San Francisco area who works primarily with William McEwen, Vice President-Sales (located in Seattle, Washington), and Vincent Pfeifer, Product Manager (also located in Seattle, Washington), virtually all of the Company's sales opportunities and transactions are consummated through Mr. McEwen and others in Seattle. That is, Seattle is the primary sales contact location and a principal place where sales negotiations are conducted on the Company's behalf.

### Research and Development

6.      Amiga's new product research and development operations are based in England, New Zealand and Sweden, with the source code located in each of those locations as well as in Seattle, Washington, and Ottawa, Canada, and a co-host location Ohio.

7.      AmigaAnywhere™ development and testing occurs in Michigan, Seattle, England, New Zealand, and Sweden.

2

**New York City**

8.      Though the Company's operations are geographically distributed, Amiga has one

central location from which major policy decisions and strategic planning directives emanate.

That location is 167 Madison Avenue, Suite 301, New York, New York 10016.

9.      Contrary to defendant's allegations, Amiga's New York location is not simply a

"mail drop." The Company's Board of Directors, which makes all strategic planning and major

policy decisions, conducts its meetings in New York. Additionally, Amiga's accounting and

payroll departments, as well as its legal representation, are located in New York City. Moreover,

the Company's website identifies 167 Madison Avenue, Suite 301, New York, New York 10016

as its "Corporate Address." See http://www.amiga.com/corporate/.

10.     Defendant's assertion that all Amiga contracts with customers used defendant's

California address is simply untrue. In fact, numerous important Amiga contracts list the 167

Madison Avenue, Suite 301, New York, New York address. For example:

> (a)     Amiga's "Arctic Software Development Agreement," dated April 7,
> 2004, lists 167 Madison Avenue, Suite 301, New York, New York as the
> address of Amiga;

> (b)     Amiga's Riverdeep Inc. Licensing Agreement, dated April 20, 2005, lists
> 167 Madison Avenue, Suite 301, New York, New York, as the notice
> address, and the cover letter accompanying the contract is addressed to
> Mr. Garry Hare, 167 Madison Avenue, Suite 301, New York, New York;

> (c)     The Distribution Agreement, dated September 1, 2005, between Amiga
> and Mobilezone directs that the a copy of the notice be forwarded to
> Amiga at 167 Madison Avenue, Suite 301, New York, New York;

> (d)     The Retail License Agreement, dated September 13, 2005, between NHL
> Interactive CyberEnterprises, LLC and Amiga specifies 167 Madison
> Avenue Suite 301, New York, New York as Amiga's principal place of
> business; and

> (e)     The Stock Purchase and Sale Agreement and Agreement of Assignment
> of Intellectual Property Rights, between Itec LLC and KMOS Inc. (the

3

prior name of Amiga) lists a 102 Prince Street, New York address for KMOS.

11.    In addition to the above contacts with New York City, some additional contacts Amiga maintains with New York City are as follows:

     (a)    The Company's banks are located in New York City;

     (b)    The Company prepares its federal income tax returns in New York City, and the tax returns identify 167 Madison Avenue, Suite 301, New York, New York 10016 as the Company's address.

     (c)    All of the members of the Board of Directors reside in New York City.

12.    Contrary to defendant's allegations, "third party royalty checks and statements" were not sent to his California office as he alleges in his declaration. (Hare Decl., ¶ 7) This is because the Company is only now in the process of generating third party royalty reports. Such reports are generated in New York City.

13.    Notably, defendant's proof of service, which was attached to his Demand for Arbitration, is addressed to Amiga, Inc., 167 Madison Avenue, Suite 301, New York, New York.

**Personal Jurisdiction**

14.    In approximately September 2003, I (and other members of Amiga's Board of Directors) engaged in negotiations concerning defendant joining Amiga as Chief Executive Officer. I negotiated on the Company's behalf from New York City with defendant by facsimile, telephone and e-mail correspondence.

15.    Amiga entered these negotiations with the intent of forming a strategic "partnership" with defendant pursuant to which defendant was required to, among other things, introduce the Company to financing and capital markets and strategic investors, manage Amiga's operations and employees, and grow the Company generally. In return, this arrangement would

be structured in such a way that defendant could potentially realize substantial financial rewards depending upon his success in growing the Company.

16.    As a result of the negotiations with defendant and his misrepresentations, Amiga agreed to form this partnership with defendant. Under this arrangement, Amiga entered into a contingent employment agreement with defendant on September 25, 2003. I signed this contingent employment agreement on behalf of Amiga in New York City. The decision to sign this contingent agreement was made in New York City. Defendant's counsel prepared the agreement.

17.    We subsequently replaced the September 25, 2003 contingent agreement with another contingent employment agreement on October 6, 2003 (hereinafter "the Contingent Agreement"). (Exhibit "A" attached to Complaint). I likewise signed this Contingent Agreement on behalf of Amiga in New York City. The decision to sign this Contingent Agreement was, like the first, made in New York City. Again, defendant's counsel prepared the agreement.

18.    New York City is a primary location of many of the financial institutions from which companies like Amiga seek funding. During our negotiations, defendant misrepresented that he had connections and relationships with industry leaders and investors in the financial services industry located in New York City. Defendant also emphasized his purported ability to secure financing from these alleged New York contacts. If not for defendant's misrepresentations, Amiga would not have signed the Contingent Agreement.

19.    As Amiga's strategic business partner, defendant was responsible for, among other things, growing the Company's business, raising capital, marketing the Company, developing a budget and operating plan, and managing the Company's overall operations. In this

capacity, defendant reported directly to me (in New York City) in my role as Board Chairman. In so reporting, defendant communicated with me at my New York City office, via telephone, facsimile and e-mail correspondence.

20.    Defendant concedes in his declaration that he "engaged in the business of [Amiga] in New York." (Decl., ¶ 8)   Consistent with his representations to me and our discussions generally prior to signing the Contingent Agreement, defendant made numerous fundraising trips to New York City to seek investors in Amiga.  In particular, defendant met in New York City with the following, among others, on behalf of Amiga:

       (a)    Allen & Company;

       (b)    Alexandra Fund;

       (c)    Goldman Sachs (Mario Draghi, Vice Chairman of Goldman Sachs International);

       (d)    Beuchamp Place Communications (Reese Schonfeld);

       (e)    Morgan Joseph; and

       (f)    hakia, Inc.

21.    Additionally, though located in California, we permitted defendant to participate in Board meetings telephonically.  These Board meetings took place in New York City.

22.    In approximately August 2005, I (and others) learned that defendant was making misrepresentations to potential investors.  As I was seriously concerned about the deleterious impact of defendant's actions on the business, and in an effort to limit any further damage defendant could cause the Company and its stockholders, I directed defendant to stop meeting with potential investors. The decision to direct defendant from ceasing such meetings was made in New York City.

23.     Anticipating that Amiga was close to ending its relationship with him because of his misrepresentations and failure to carry out his responsibilities, defendant chose to voluntarily terminate the relationship on August 4, 2005. He did so by sending a resignation letter to Board member John Grzymala, Corporate Secretary, and me via e-mail correspondence in New York City. Mr. Grzymala and I were in New York City when we received and accepted the resignation.

24.     In his role, defendant was required to submit expenses to New York City for authorization by me and subsequent reimbursement. Additionally, pay checks and expense checks issued to defendant were sent from New York City.

**Arbitration**

25.     As earlier noted, in signing the Contingent Agreement with defendant, Amiga sought to form a strategic "partnership" structured in such a way that defendant could realize financial rewards depending upon defendant's success in growing the Company.

26.     For instance, the Contingent Agreement would provide defendant 1,750,000 shares of Company stock, as well as "a cash bonus determined according to the following formula: cash bonus of 2% of the growth in gross revenue calculated annually and based on the anniversary date of th[e] agreement." (Contingent Agreement, §4(d))

27.     Under the Contingent Agreement, defendant's base salary would be $300,000 per year. (Contingent Agreement, §4(a)) Additionally, the Contingent Agreement "entitled [defendant] to participate in any stock option, profit sharing, retirement, group insurance, hospitalization, medical, dental, health and accident, disability or similar plan or program of [Amiga]...." (Contingent Agreement, §4(b)) Further, the Contingent Agreement would provide defendant with

"full medical coverage for himself, his spouse, and dependents younger than eighteen years of age."
Id.

28.     Defendant could terminate the Contingent Agreement at any time, without any penalty.

29.     In return for the extremely generous financial provisions and benefits specified in the Contingent Agreement, defendant was expected to introduce the Company to financing and capital markets and strategic investors, manage Amiga's operations and employees, and grow the Company. However, before simply agreeing to be bound by an agreement that would provide defendant with substantial compensation and benefits, I wanted assurances that defendant would be able to raise capital for the Company. In that regard, defendant and I included a provision in the Contingent Agreement making clear that "[t]his agreement in its entirety [was] contingent on [the Company] securing a minimum of $1,000,000 in funding for the operation of the Company." (Contingent Agreement, Introductory Section)

30.     The purpose and intent of this provision was to make the Contingent Agreement conditional upon Amiga, through defendant's direct connections and efforts, securing a minimum of $1,000,000 in funding for the operations of Amiga. The Company engaged defendant for the primary purpose of raising capital and growing the business. We did not want to undertake an obligation of providing defendant with an extremely generous benefit package (including paying him a $300,000 annual salary) until defendant demonstrated to us that he could in fact raise capital.

31.     I explained to defendant that we did not want to undertake such an onerous employment contract until defendant first demonstrated the Company would receive some value

in return for the generous provisions in the Contingent Agreement. Defendant understood the Company's position.

32.    The Company never secured a minimum of $1,000,000 in funding for the operations of Amiga through defendant's direct efforts. While the Company raised $1,000,000 from the "completion of a private placement on or about May 10, 2004," as defendant contends, none of that money resulted from defendant's efforts. Indeed, notably absent from defendant's declaration is any statement that he was responsible for that $1,000,000. This is because the Company did not secure any funding as a result of defendant's connections and efforts. Consequently, the Contingent Agreement, in its entirety (including the arbitration provision), never took effect.

33.    Defendant was unable to cause Amiga to enter into contracts with service providers, or more fundamentally, to generate any revenues. Further, Amiga lost many potential clients and investors because, in addition to being arrogant and abrasive, defendant made misrepresentations to such clients and investors.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

_____
PENNTI KOURI

Dated: December ___, 2005

9