UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIGA, INC., f/k/a KMOS, INC.,

                                    Plaintiff,

*vs*.

GARRY HARE,

                                    Defendant.

Civil Action No. 05-CV-8986 (DAB)

---

**MEMORANDUM OF LAW ON BEHALF OF PLAINTIFF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION TO DISMISS OR, ALTERNATIVELY, STAY ARBITRATION**

---

REED SMITH LLP
599 Lexington Avenue, 29th Floor
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:   (212) 521-5450
Attorneys for Plaintiff
Amiga, Inc., f/k/a KMOS, Inc.

Of Counsel and On the Brief:
    Robert H. Bernstein, Esq. *

On the Brief:
    Stephen D. Bird, Esq. (SB/7294)
    Christian R. White, Esq. (CW/7537)

* admitted *pro hac vice*

NWKLIB-90411.5

Dockets.Justia.com

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT ........................................................................................................................2

    I.    Diversity Jurisdiction Exists Because Plaintiff is a Citizen of California
    and Amiga's Principal Place of Business is in New York ...................................2

    II.    This Court May Exercise Personal Jurisdiction Over Defendant Because
    Defendant  Purposefully Availed Himself of this Court's Jurisdiction ...............7

    III.    As a Substantial Part of the Events Arose in New York, this Court is a
    Proper Venue for this Action ...........................................................................10

    IV.    The Court Should Dismiss or Alternatively Stay the California Arbitration......13

        A.    As the Undisputed Material Facts Demonstrate Defendant Never
        Satisfied the $1 Million Condition Precedent, the Court Should
        Declare the Contingent Agreement Void and Dismiss the
        California Arbitration.............................................................................14

        B.    Alternatively, the Court Should Stay the Arbitration Pending
        Resolution of the Instant Action ............................................................16

CONCLUSION.....................................................................................................................20

## PRELIMINARY STATEMENT

Plaintiff, Amiga, Inc., f/k/a KMOS, Inc. ("Amiga"), filed a Complaint on October 21, 2005 seeking, among other relief, a declaration that its contingent employment agreement with defendant, Garry Hare, is void because defendant did not satisfy a vital and express condition precedent to enforcement of that document. Amiga served defendant with the Complaint on October 24, 2005. On November 4, 2005, defendant commenced an arbitration with JAMS against Amiga and the Chairman of its Board of Directors, Pentti Kouri, seeking to enforce provisions of the contingent agreement he claims Amiga allegedly breached. By letter dated November 14, 2005, Amiga informed JAMS that it did not consent to the arbitration as the agreement between Amiga and Mr. Kouri and defendant is invalid.

Amiga now submits this memorandum of law in opposition to defendant's motion to dismiss Amiga's Complaint and in support of its cross-motion to dismiss or, alternatively, to stay the arbitration proceeding defendant commenced. Defendant mistakenly claims that this Court lacks subject matter and personal jurisdiction and that venue is improper. That is not so. Defendant reported directly to Mr. Kouri, who works and resides in New York City, in his role as Board Chairman, and regularly communicated with Mr. Kouri at his New York City office, via telephone, facsimile and e-mail correspondence. Moreover, as a critical part of his job responsibilities, defendant made numerous fundraising trips to New York City to seek investors in Amiga. Defendant also regularly participated telephonically in Board meetings that took place in New York City. Further, in negotiating the contingent employment agreement, defendant misrepresented to Mr. Kouri that he maintained extensive connections and relationships with industry leaders and investors in the financial services industry in New York City, and emphasized his purported ability to secure financing from these alleged New York contacts. Accordingly, this Court may clearly retain jurisdiction over this action, and this District is an appropriate venue.

Equally meritless is defendant's contention that this controversy is subject to arbitration. However, as defendant failed to satisfy the agreement's condition precedent, the agreement, including the arbitration provision, never took effect and, hence, is void. Consistent with Second Circuit law, this Court must dismiss or, alternatively, stay the California arbitration pending a determination whether the contingent agreement ever became effective.

## ARGUMENT

### I.   Diversity Jurisdiction Exists Because Plaintiff is a Citizen of California and Amiga's Principal Place of Business is in New York

Defendant, a California citizen, attempts to evade this Court's jurisdiction by contending that Amiga's principal place of business is his California residence. Defendant is mistaken. As set forth below, the facts firmly establish Amiga's principal place of business is in New York. That being so, and because it is undisputed that more than $75,000 is at issue, diversity jurisdiction exists.

The Second Circuit recognizes two tests for determining a corporation's principal place of business: (1) the "nerve center" test; and (2) the "public impact" or "place of operations" test. R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979). Defendant incorrectly relies upon the "place of operations" test. Settled law makes clear that courts must apply the "nerve center" test where, as here, a corporation's activities are decentralized and spread across many different states. Id.; accord Scot Typewriter Co. v. Underwood Corp., 170 F. Supp. 862, 865 (S.D.N.Y. 1959) (noting that when a corporation is involved in "far-flung . . . activities . . . carried out in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities . . ., in the furtherance of the corporate objective.")) (citations omitted).

Here, the "nerve center test" is particularly applicable due to the geographical scope of the Company's operations. Amiga is a corporation that operates internationally by producing

and distributing enabling technologies and applications for wired and wireless devices.  (Kouri Decl., ¶3).  Amiga's new product research and development operations are based in England, New Zealand and Sweden, with the source code located in each of those locations, as well as in Seattle, Washington, and Ottawa, Canada, and a co-host location in Ohio. (Kouri Decl., ¶6).  The Company also conducts development and testing in Michigan, Seattle, England, New Zealand, and Sweden. (Kouri Decl., ¶7).

Further, Amiga employs a salesperson in the San Francisco area who works primarily with other employees located in Seattle.  In this regard, a vast majority of the Company's sales opportunities and transactions are consummated through other employees in Seattle.  That is, Seattle is the primary sales contact location and a principal place where sales negotiations are conducted on the Company's behalf. (Kouri Decl., ¶5).

The above facts demonstrate that Amiga's activities are carried out in different states and countries, thus mandating application of the "nerve center" test.  See R.G. Barry Corp., 612 F.2d at 655; Peters v. Timespan Comm., Inc., No. 97 Civ. 8750, 1999 U.S. Dist. LEXIS 2797, *15-16 (S.D.N.Y. Mar. 12, 1999); Scot Typewriter Co., 170 F. Supp. at 865.  Consequently, Amiga's "principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities . . . in the furtherance of the corporate objective."  Scot Typewriter Co., 170 F. Supp. at 865.

In applying the "nerve center" test, "courts focus on those factors that identify the place where the corporation's overall policy originates."  Peters, 1999 U.S. Dist. LEXIS 2797, at *15 (citing R.G. Barry Corp., 612 F.2d at 655).  To determine where a company's "overall policy originates," courts consider the following factors: (i) where board meetings take place; (ii) where the company's officers live and work; (iii) where the company's official mail is received; (iv) where company corporate books and records are maintained; and (v) where major decisions

3

regarding the company are made. <u>Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.</u>, 101 F.3d 900, 906 (2d Cir. 1996). "In other words, the nerve center test places the principal place of business at the location of a company's headquarters." <u>Peters</u>, 1999 U.S. Dist. LEXIS 2797, at *16.

This Court's decision in <u>Peters</u>, <u>supra</u>, is particularly instructive. There, plaintiff (a California resident) brought an action in New York against Timespan Communications, Inc. ("Timespan"). <u>Id</u>. at *1. Timespan sought to dismiss the action for lack of subject matter jurisdiction, claiming that because its principal place of business was in California, complete diversity was lacking. <u>Id</u>. at *5. Plaintiff countered that Timespan's principal place of business was New York. <u>Id</u>.

Timespan entered into an employment agreement with plaintiff as its President and Chief Executive Officer, a position requiring plaintiff to work in California. <u>Id</u>. at *4. Although plaintiff conducted business on the company's behalf in California, Timespan engaged in business from its New York offices. <u>Id</u>. at *6.

The Court denied defendant's application, concluding that Timespan's principal place of business was New York. In so holding, the Court reasoned that although neither the "nerve center" test nor the "place of operations" test was "perfectly applicable," the following factors were instrumental in the Court's determination:

- Timespan's general financing, accounting, and payroll support functions were performed in New York.

- Timespan's financial and tax records were maintained in New York and Timespan's tax returns, including its California corporate income tax returns, were prepared in New York and showed a New York address.

- Timespan's bank accounts were in New York.

- Several of Timespan's officers maintained offices in New York.

- Board of Directors meetings occurred in New York.

4

- Timespan's business activities were supervised from New York.

<u>Id</u>. at * 19-20.

Based on the foregoing, the Court concluded that Timespan's principal place of business at the time the action was commenced was New York, and that it was therefore a citizen of New York, not California. Accordingly, complete diversity of citizenship existed, warranting the exercise of subject matter jurisdiction over the dispute. <u>Id</u>. at * 23.

As set forth more fully in the Mr. Kouri's declaration, Amiga's "nerve center" is New York City. Indeed, as in <u>Peters</u>, Amiga has the following compelling connections to New York City:

- Amiga's accounting and payroll, as well as its legal representation, are (and at all relevant times have been) located and performed in New York City. (Kouri Decl., ¶9).

- The Company prepares its federal income tax returns in New York City, and the tax returns identify 167 Madison Avenue, Suite 301, New York, New York, as the Company's address. (Kouri Decl., ¶11).

- The Company's banks are in New York. (Kouri Decl., ¶11).

- The Company's website identifies 167 Madison Avenue, Suite 301, New York, New York 10016 as its "Corporate Address." (Kouri Decl., ¶9).

- Amiga's Board meetings took place and continue to take place in New York. (Kouri Decl., ¶¶9 and 21).

- A majority of Amiga's officers live and work in New York. (Kouri Decl., ¶¶ 11 and 21).

- The Company's Board of Directors makes all strategic planning and major policy decisions from New York. (Kouri Decl., ¶8).

- Defendant's proof of service, attached to his Demand for Arbitration, is addressed to Amiga, Inc., 167 Madison

Avenue, Suite 301, New York, New York. (Kouri Decl., ¶13).

<u>Compare</u> <u>Peters</u>, 1999 U.S. Dist. LEXIS 2797, at * 19-20.

In addition (and contrary to defendant's spurious allegation that "all contracts with customers contained [defendant's] address," Def.'s Decl. ¶7), the following important Amiga contracts list 167 Madison Avenue as the Company's corporate address:

- Amiga's April 7, 2004 "Arctic Software Development Agreement" lists 167 Madison Avenue, Suite 301, New York, New York, as the address of Amiga.

- Amiga's April 20, 2005 Riverdeep Inc. Licensing Agreement lists 167 Madison Avenue, Suite 301, New York, New York, as the notice address and the cover letter accompanying the contract is addressed to Mr. Garry Hare, 167 Madison Avenue, in New York.

- Amiga's September 1, 2005 Distribution Agreement between Amiga and Mobilezone directs that a copy of the notice be forwarded to Amiga at 167 Madison Avenue, Suite 301, New York, New York.

- A September 13, 2005 Retail License Agreement between NHL Interactive CyberEnterprises, LLC and Amiga specifies 167 Madison Avenue Suite 301, New York, New York, as the principal place of business of Amiga.

- A Stock Purchase and Sale Agreement and Agreement of Assignment of Intellectual Property Rights between Itec LLC and KMOS Inc. (the prior name of Amiga) lists a 102 Prince Street, New York, New York address for KMOS. (Kouri Decl., ¶10 ).

In short, any suggestion by defendant that Amiga's corporate address of 167 Madison Avenue, Suite 301, New York, New York is merely a "mail drop" is meritless.  As set forth above, Amiga's principal place of business is New York City, thus establishing diversity jurisdiction.

## II.    This Court May Exercise Personal Jurisdiction Over Defendant Because Defendant Purposefully Availed Himself of this Court's Jurisdiction

Defendant alternatively seeks to dodge this Court's jurisdiction by relying on the tired and over-used theory that because he allegedly resides in another state, this Court cannot exercise jurisdiction over him.    Plaintiff's assertion is meritless.    Well-settled principles governing personal jurisdiction make clear that where, as here, a defendant purposefully availed himself of the forum state, jurisdiction is proper, irrespective of where defendant claims he may reside.

For personal jurisdiction to attach under New York's long-arm statute, CPLR § 302(a)(1), there must be an articulable nexus between the cause of action and the defendant's actions in New York.  Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 23 (2d Cir. 2005).  Toward this end, courts consider whether an out-of-state defendant transacts business in New York, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract….

Id. at 22 (citing Agency Rent A Car Sys. Inc., 98 F.3d at 29 (internal citations omitted)).  No one factor is dispositive.  "The ultimate determination is based on the totality of the circumstances." Id.; accord M. Fabrikant & Sons, Inc. v. Adrianne Kahn, Inc., 533 N.Y.S.2d 866, 868 (App. Div. 1st Dept. 1988) (finding that the totality of the circumstances support New York as proper jurisdiction).  In determining whether there are sufficient contacts for personal jurisdiction, "all pleadings and affidavits must be construed in the light most favorable to [plaintiff] and all doubts must be resolved in . . . plaintiff's favor."  GCG Int'l, Inc. v. Eberhardt, No. 05 Civ. 2422, 2005 U.S. Dist. LEXIS 23877, *6 (S.D.N.Y. Oct. 17, 2005) (citing Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)).

In any event, Section 302(a)(1) is a single act statute, meaning that proof of one transaction in New York is sufficient to invoke the jurisdiction of this Court, even if defendant never entered New York (which he often did), so long as his activities in New York were purposeful and substantially related to the transaction and claim asserted.  See Agency Rent A Car Sys., Inc., 98 F.3d at 31 (questioning "whether, in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of consequence"); accord Opticare Acquisition Corp. v. Castillo, 2005 NY Slip Op 8296 (N.Y. App. Div. Nov. 7, 2005).

Here, the totality of the circumstances establish that this Court plainly has personal jurisdiction over defendant.  This dispute emanates from the strategic partnership Amiga formed with defendant, beginning in approximately September 2003.  (Complaint, ¶10)  As set forth more fully in Mr. Kouri's declaration, that partnership was inextricably intertwined with New York City.  For instance:

- Mr. Kouri negotiated the strategic partnership with defendant by facsimile, telephone and e-mail correspondence from Amiga's New York City office. (Kouri Decl., ¶14).

- Mr. Kouri signed both contingent agreements (i.e., dated September 23, 2003 and October 6, 2003) on behalf of Amiga in New York City.  The decision to offer and sign this contingent agreement was made in New York City. (Kouri Decl., ¶¶ 16-17).

- During the negotiations, defendant misrepresented that he had extensive connections and relationships with industry leaders and investors in the financial services industry located in New York City.  Defendant also emphasized his purported ability to secure financing from these alleged New York contacts. (Kouri Decl., ¶18).

- Defendant reported directly to Mr. Kouri (in New York City) in his role as Board Chairman and therefore regularly communicated with Mr. Kouri at his New York City office, via telephone, facsimile and e-mail correspondence.  (Kouri Decl., ¶19).

- Defendant made numerous fundraising trips to New York City to seek investors in Amiga.  (Kouri Decl., ¶20).

- Defendant regularly participated in Board meetings telephonically, which took place in New York City. (Kouri Decl., ¶21).

Based upon the above, it strains credulity for defendant to maintain that he does not have sufficient contacts with New York for this Court to exercise jurisdiction over him.  Indeed, courts in this Circuit have exercised personal jurisdiction over defendants residing outside of New York under far less compelling circumstances.

Parke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 16 (1970), is particularly instructive. There, the Court decided that a California resident "transacted business" under CPLR 302(a)(1) when he participated (while in California) via an open telephone line in an art auction conducted in New York City.  After defendant failed to pay for the art, Parke-Bernet sued him in New York.

Despite the extremely limited nature of defendant's contacts with New York, the Court held that such contacts were sufficient to confer personal jurisdiction on the Court.  Id. at 17-18. In so holding, the Court noted that the purpose of New York's long-arm statute was to "extend" the jurisdiction of New York's courts to nonresidents who have "engaged in some purposeful activity [in New York] . . . in connection with the matter in suit."  Id. at 16 (emphasis added). The fact that defendant was not physically present in the auction room in New York was of no consequence.  Rather, the controlling fact was that defendant, by attempting to affect the bidding in New York via an open telephone line, was sufficient to demonstrate that defendant "purposefully availed himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws."  Id. at 18.

As defendant's mere telephone call from California to New York in Parke-Bernet Galleries was sufficient to confer personal jurisdiction on a New York court over a California

9

resident, defendant's contacts here are plainly sufficient to find that he availed himself of this Court's jurisdiction. The above facts demonstrate the extensive contacts defendant and the contemplated strategic partnership had with New York City – contacts that, unlike those in Parke-Bernet Galleries, were repeated over a period of approximately two years and which, as defendant himself admits, involved defendant's physical presence in the forum. (Def.'s Decl., ¶8) (admitting that he engaged at least "in a few meetings over the last few years [in New York]"). Under such circumstances, this Court has personal jurisdiction over defendant.

**III.    As a Substantial Part of the Events Arose in New York, this Court is a Proper Venue for this Action**

Under 28 U.S.C. § 1391(a)(2), venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Venue is likewise appropriate even in a district "where a substantial part of the events or omissions occurred, […] even if a greater portion of events occurred elsewhere." Id.; see also Largotta v. Banner Promotions, Inc., 356 F. Supp. 2d 388, 391 (S.D.N.Y. 2005) ("The fact that substantial activities also took place in other districts, and hence that venue is also proper there, does not preclude a finding that venue is proper in the Southern District of New York"). In determining whether venue is proper, the Court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff … and [] against the defendant[]." Concesionaria v. Int'l Finance Corp., 307 F.Supp.2d 553, 559 (S.D.N.Y. 2004).

Contrary to defendant's naked assertions, a "substantial part of the events" relative to this action clearly occurred in this district. As earlier noted, (i) Amiga negotiated the September and October 2003 agreements from New York City with defendant via facsimile, telephone and e-mail correspondence; (ii) Mr. Kouri offered and signed the September and October 2003 contingent agreements on behalf of Amiga in New York City; (iii) defendant regularly

communicated with Mr. Kouri in New York City; (iv) defendant regularly participated in Board meetings conducted in New York City; (v) defendant regularly traveled to New York City; and (vi) defendant chose to voluntarily terminate his relationship with Amiga by sending a resignation letter to Mr. Kouri and Board member John Grzymala, Corporate Secretary, via e-mail correspondence to their New York City offices.

These facts demonstrate that venue in this district is proper. See Concesionaria, 307 F.Supp.2d at 558-59 ("courts consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred"); Regency Capital, LLC, 2003 U.S. Dist. LEXIS 18701, at * 8 (finding venue in New York where contract negotiated in New York by Board member located in New York); accord Schomann Int'l Corp. v. N. Wireless, Ltd., 35 F. Supp. 2d 205, 213 (N.D.N.Y. 1999) (finding that agreement negotiated by telephone, fax and letter without face-to-face contact was "negotiated and executed in both New York and Iowa"); (Def.'s Decl., ¶9, admitting that venue in the Southern District is "technically proper").

Defendant, in fact, admits that venue is proper here. He makes, however, the "half-hearted" and empty claim "the Court should transfer the action to the Northern District of California pursuant to 28 U.S.C. 1404(a)," apparently based on the convenience of the witnesses. (See Def.'s Br.. p. 6). For the reasons set forth below, defendant fails to overcome the strong presumption in favor of allowing this action to be adjudicated in New York, which is the forum where it was first filed.

It is well-settled that "[a]bsent a clear cut and convincing showing by defendant that the balance of convenience weighs strongly in favor of the transferee court, plaintiff's choice of forum will not be set aside." See Oubre v. Clinical Supplies Management, Inc., No. 05 Civ. 2062, 2005 U.S. Dist. LEXIS 28877, * 4-5 (S.D.N.Y Nov. 17, 2005) (citing Gen. State Auth. (of

Pa.) for Benefit of Crompton-Richmond Co., Inc. v. Aetna Cas. & Sur. Co., 314 F.Supp. 422, 423 (S.D.N.Y. 1970)).  Thus, in order for defendant to meet this heavy burden of demonstrating that transfer is in the convenience of the witnesses, he must "'specifically list the evidence and witnesses on which [he] intends to rely in the transferee district, along with a general statement of the topics of each witness' testimony.'"  Pilates, Inc. v. Pilates Institute, Inc., 891 F.Supp. 175, 183 (S.D.N.Y. 1995) (internal citations omitted); see also Kiss My Face Corp. v. Bunting, No. 02 Civ. 2645, 2003 U.S. Dist. LEXIS 17096, *2 (S.D.N.Y. Sept. 30, 2003).  "Absent such a showing, the motion should be denied."  Pilates, Inc., 891 F.Supp. at 183.

Although defendant identified three employees who may have information about Amiga and defendant's employment, he has failed to say anything about the substance of their testimony.  (See Def.'s Decl., ¶9).  As defendant has failed to provide a scintilla of information concerning what each witness' testimony will cover, it is impossible for the Court to conclude that this action merits transfer.  See Pilates, Inc., 891 F.Supp. at 183 (holding that a party's 1404(a) motion should be denied absent a detailed list of potential "witnesses on which the party intends to rely in the transferee district, along with a general statement of the topics of each witness's testimony."); see also Orb Factory, Ltd. v. Design Science Toys, Ltd., 6 F.Supp. 2d 203, 208-209 (S.D.N.Y. 1998) (denying defendant's motion to transfer where defendant failed to specify the materiality of the testimony of prospective witnesses, nor whether their presence would be necessary at trial).

Transfer is also inappropriate because the primary witnesses possessing information about the material claims in this lawsuit, Mr. Kouri and Mr. Grzymala, work from Amiga's New York City offices and lives in New York City.  (Kouri Decl., ¶23).  Furthermore, two of the three potential Amiga employee-witnesses identified by defendant (William McEwen and Vince Pfeiffer) do not reside in either proposed forum.  Rather, they live and work in Seattle,

Washington, a fact that does not affect the Court's transfer analysis. (Kouri Decl., ¶5). Moreover, defendant has not even alleged that either person was involved in any of the decisions that form the basis of this action.  See Oubre, 2005 U.S. Dist. LEXIS 28877, at *6 (convenience of witnesses who do not reside in either proposed forum does not significantly affect the transfer analysis).

Finally, to the extent defendant seeks to use the purported "choice of law" provision contained in the contingent agreement as a "choice of forum" provision, he is unconvincing.  It is well-settled that a choice of law provision and forum selection clause are two separate and distinct provisions. Anderson v. Canarail, Inc., No. 05 Civ. 3828, 2005 U.S. Dist. LEXIS 22544, *8 (S.D.N.Y. Oct. 6, 2005) (explaining that a choice of law provision does not automatically constitute a voluntary submission to personal jurisdiction in the forum and cannot transform the choice of law provision into a choice of forum provision); In re Lois/USA, Inc., 264 B.R. 69, 101 (Bankr. S.D.N.Y. 2001) ("A choice-of-law clause and a forum selection clause are not the same, and address different needs and concerns").

## IV.    The Court Should Dismiss or Alternatively Stay the California Arbitration

Defendant mistakenly asserts that this Court should compel to arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. §4, et seq. (the "FAA"), based on the arbitration clause contained in the contingent agreement between Amiga and defendant.  To the contrary, the Court must dismiss the California arbitration as the underlying agreement is void. Alternatively, the Court should stay the California arbitration pending a determination on whether the contingent agreement ever became effective.

As set forth below, the agreement, taken as a whole, conditioned its entire existence, including the arbitration clause, upon defendant's ability to secure $1,000,000 in funding for the operations of Amiga. (Complaint, ¶¶ 10, 11); (Kouri Decl., ¶30).  As defendant failed to satisfy

13

this condition precedent, the agreement never took effect and, hence, is void.  Under such circumstances, arbitration is improper as a matter of law.

> **A.    As the Undisputed Material Facts Demonstrate Defendant Never Satisfied the $1 Million Condition Precedent, the Court Should Declare the Contingent Agreement Void and Dismiss the California Arbitration**

It is well-settled that in the context of motions to compel arbitration brought under Section 4 of the FAA, the Court applies a standard similar to that applicable for a motion for summary judgment.  If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.  Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).  Indeed, the summary judgment standard is appropriate in cases where the district court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration. Id.

Here, there is no question that the agreement required defendant to satisfy the condition precedent.  The contingent agreement makes clear that the "agreement in its entirety [was] contingent on [the Company] securing a minimum of $1,000,000 in funding for the operation of the Company."  (Complaint Exh. A – Introductory Section).  As set forth in Mr. Kouri's declaration, before the Company committed to a contractual obligation to provide defendant with extremely generous benefits, the parties agreed that defendant, through his claimed direct connections and efforts, would secure a minimum of $1,000,000 in funding for the operations of Amiga.  (Kouri Decl., ¶¶ 30-31).  A plain and common sense reading of the contingent agreement supports this conclusion.

Under the contingent agreement, defendant's base salary would be $300,000 per year and defendant would be "entitled … to participate in any stock option, profit sharing, retirement, group insurance, hospitalization, medical, dental, health and accident, disability or similar plan or program of [Amiga]…." (Kouri Decl., ¶27).   Further, the contingent agreement provided defendant with

"full medical coverage for himself, his spouse, and dependents younger than eighteen years of age," and permitted defendant to terminate the contingent agreement at any time, without any penalty. (Kouri Decl., ¶27).

Defendant would have this Court believe that the $1 million contingency clause did not apply to him. Considering the strategic business partnership between the parties, however, such a reading of the contingent agreement is contrary to common logic. Indeed, it strains credulity for defendant to maintain that Amiga would agree to award him significant amounts of stock and compensate him with a substantial salary and other generous benefits without requiring him to first demonstrate his ability to generate investments for Amiga. Put simply, defendant, whose counsel drafted the contingent agreement, suggests he would be entitled to the fruits of the contract without having to perform the labor of securing the $1 million in funding – a responsibility consistent with the entire aim of the strategic business partnership (i.e., that defendant would grow the Company's business and raise capital). (Kouri Decl., ¶¶17, 18, 19, 31). Defendant's strained interpretation flies in the face of common sense and would lead to an absurd result. Under such circumstances, no reasonable fact-finder could conclude that the $1 million contingency did not apply to defendant. See World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) ("the cardinal principle for the construction and interpretation of […] all contracts -- is that the intentions of the parties should control […] and absurd results should be avoided").

Accordingly, as the undisputed facts demonstrate that defendant did not satisfy this contingency, the underlying agreement is void. Consequently, the Court should declare the contingent agreement void and dismiss the arbitration.

**B.      Alternatively, the Court Should Stay the Arbitration Pending Resolution of the Instant Action**

Even assuming defendant somehow establishes a material dispute respecting the contingent agreements terms (which he cannot), the Court is nevertheless precluded from directing the parties to arbitration.  Under Section 4 of the FAA, a district court may order the parties to proceed to arbitration in accordance with the terms of the arbitration agreement <u>only</u> "upon being satisfied that the making of the agreement for arbitration ... is not at issue." However, "when parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the 'court shall proceed summarily to ... trial' of the issue."  <u>U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.</u>, 241 F.3d 135, 145 (2d Cir. 2001) (<u>quoting</u> 9 U.S.C. § 4).

Hence, "if the making of an arbitration agreement is placed in issue ... the court must set the issue for trial…."  <u>Sphere Drake Ins. Ltd. v. Clarendon National Ins. Co.</u>, 263 F.3d 26, 30 (2d Cir. 2001).  Indeed, "before a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it entered into an agreement which obliges it to consent to arbitration."  <u>PMC, Inc. v. Atomergic Chemetals Corp.</u>, 844 F. Supp. 177, 181 (S.D.N.Y. 1994); <u>see</u> <u>also</u> <u>U.S. Titan, Inc.</u>, 241 F.3d at 45 ("when parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the 'court shall proceed summarily to ... trial' of the issue"); <u>The Canada Life Assurance Co. v. The Guardian Life Ins. Co. of America</u>, 242 F.Supp. 2d 344 (S.D.N.Y. 2003) ("It is well-settled that when the existence of the contract from which the obligation to arbitrate arises is itself called into question, it is the obligation of the court, before a dispute is referred for arbitration, to determine, in the first instance, whether the contract itself is valid"); <u>Daewoo Corp. v. Olsen</u>, No. 87 Civ. 2251, 1989 U.S. Dist. LEXIS 13463 (S.D.N.Y. Nov. 15, 1989) (holding that court must

16

first determine whether the underlying contract exists prior to considering the arbitration provision).

The Second Circuit's opinion in El Hos Engineering and Transport Co. v. American Independent Oil Co., 289 F.2d 346 (2d Cir. 1961), is directly on point. In El Hos, American Independent Oil Company ("Amnioil") entered into a contract with El Hos under which Amnioil would sell El Hos transportation equipment and then lease the equipment back from El Hos. The agreement contained an arbitration clause providing for the arbitration of "any disagreement between the parties … as to the effectuation of th[e] agreement…." Id. at 348. Additionally, the agreement conditioned Amnioil's acceptance on El Hos' performance of certain conditions precedent respecting guarantees covering the purchase price, performance bonds and insurance protection. Id. Specifically, the agreement included a clause providing that the agreement was

> subject to [El Hos'] compliance with the conditions of this agreement as to guarantees or endorsements by third parties in favor of the [Amnioil] covering the unpaid installments on purchase price, performance bonds and insurance coverage, etc., not later than fourteen (14) days from the date of the acceptance by [Amnioil]. [Id.]

A dispute arose between the parties as to whether El Hos complied with the contingent obligations pursuant to the terms of the contract. El Hos subsequently sought an order compelling Amnioil to arbitrate the dispute. Id. at 348.

The Court rejected El Hos' attempt to compel arbitration, holding that the entire agreement, including the arbitration clause, was expressly conditioned upon El Hos complying with the contingent obligations. Id. at 349. The Court dismissed any notion that Amnioil sought to bring "sham litigation" simply to avoid arbitration, noting that a complete reading of the contract disclosed that Amnioil sought only to protect itself from being bound by the agreement until El Hos met the conditions. Id. The Court reasoned:

17

Amnioil made it clear that the enjoyment by a bidder for the contract of the contractual fruits and duties was conditioned on the bidder's prior performance of the prior acts required of that successful bidder. Every clause including the arbitration clause was expressly so conditioned.

\*\*\*

[T]he parties did not agree to arbitrate any disagreements as to performance by El Hoss of the threshold acts it was required to perform. We hold that adjudication of those disagreements is the responsibility of the court; and our next inquiry is directed to discovering whether El Hoss did in fact perform the acts which, if performed, would give it the right to obtain a court order directing arbitration of all disputes arising from disagreements 'as to the effectuation of \* \* \* or performance \* \* \* of the agreement.' [Id. at 350.]

In reaching its conclusion, the Court found "no reason in fact or in law for a frustration of the parties' clearly demonstrated intent." Id. at 349. "[C]onsidering the size of the transaction it [was] patently understandable [to the Court] that Amnioil would choose to condition its obligations under the contract, including its obligation to arbitrate, upon the prior performance by [El Hos] of basic financial guarantees." Id.

As in El Hos, Amiga and defendant did not agree to arbitrate any disputes respecting defendant's contingent obligations. Every clause, including the arbitration clause, was expressly conditioned upon defendant complying with the contingent obligations. Indeed, the provision in the contingent agreement is clear: "[T]his agreement in its entirety is contingent on [the Company] securing a minimum of $1,000,000 in funding for the operation of the Company." (Complaint, Exh. A – Introductory Section) (emphasis added)). The undisputed facts establish that defendant failed to satisfy his contingent obligations by failing to secure the requisite funding for the Company. Therefore, and as earlier noted, the Court should dismiss the California arbitration as no issue of fact exists.

18

Alternatively, in the unlikely event the Court finds an issue of fact respecting defendant's performance, the Court, prior to directing the parties to arbitrate any disputes, must stay the California arbitration and determine whether defendant fulfilled the contingent obligations. El Hos, 289 F.2d at 350 ("'Courts are not at liberty to shirk the process of construction under the empire of a belief that arbitration is beneficent any more than they may shirk it if their belief happens to be the contrary").

Finally, to the extent defendant claims that the Court should "sever" the arbitration clause from the void contingent agreement and compel arbitration based on a fraudulent inducement claim, such an argument is unavailing. (Def.'s Br., p. 7). The doctrine of severability presumes a valid underlying agreement. It draws a distinction between contracts that are asserted to be "void" or non-existent, as is contended here, and those that are merely "voidable," for purposes of evaluating whether the making of an arbitration agreement is in dispute. Denney, 412 F.3d at 67; El Hos, 289 F.2d at 351-352. This distinction is crucial because Amiga's claim involves more than just fraud in the inducement, a voidable defense; the instant case involves fraud in the execution of the agreement, as well as defendant's failure to satisfy a vital and condition precedent, either of which are sufficient to void the contingent agreement. Denney, 412 F.3d at 67 (where a party presents some evidence in support of their claim that the underlying agreement is void (i.e., never took effect), such party is entitled to a judicial determination of the issue).

Based on the foregoing, the Court should declare the contingent agreement void and dismiss the California arbitration. Alternatively, the Court should stay the California arbitration and proceed to a summary trial on the issue of whether the underlying contingent agreement is void due to defendant's failure to satisfy his contingent obligations. See The Canada Life Assurance Co., 242 F.Supp. 2d at 349 ("since this issue is now properly before the Court and not the arbitration panel, it does not make sense for [Amiga] to be required to engage in arbitration

proceedings, or be faulted for not so engaging, until this threshold issue has been decided"); see also SATCOM Int'l Group PLC v. ORBCOMM Intl' Partners, L.P., 49 F.Supp.2d 331, 337-339 (S.D.N.Y. May 27, 1999) (granting cross-motion to stay arbitration under FAA); L.F. Rothschild & Co. v. Katz, 702 F. Supp. 464 (S.D.N.Y. 1988) (granting motion to enjoin arbitration under Section 4 of the FAA); accord Societe Generale De Surveillance, S.A. v. Raytheon European Management & Sys. Co., 643 F.2d 863 (1st Cir. 1981) (same); Weis Builders, Inc. v. Kay S. Brown Living Trust, 236 F.Supp.2d 1197, 1204 (D.Co. 2002) (staying arbitration under Section 4 of the FAA pending determination of whether valid agreement to arbitrate exists); see also Textile Unlimited, Inc. v. A..BMH and Co., Inc., 240 F.3d 781 (9th Cir. 2001) (affirming district court's stay of arbitration so it could determine whether plaintiff had assented to arbitration clause hidden on back of invoice).

## CONCLUSION

For the foregoing reasons, Amiga respectfully requests that this Court deny defendant's motion to dismiss in its entirety and enter an order declaring the contingent agreement void and dismissing the California arbitration. In the alternative, the Court should stay the arbitration pending resolution of the instant action.

Dated:        New York, New York
              December 19, 2005

                                      REED SMITH LLP


                                      By:_____/s/ Robert H. Bernstein*_____
                                       ROBERT H. BERNSTEIN (RB1835)
                                          A Member of the Firm

                                       599 Lexington Avenue
                                       New York, New York 10022
                                       Telephone:  (212) 521-5400
                                       Facsimile:  (212) 521-5450
                                       *Attorneys for Plaintiff Amiga, Inc.*

                                       (*admitted pro hac vice)*